UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID ALLEN NEY,

       Plaintiff,

v.

CAROLYN W. COLVIN,

       Defendant.

Case No.  15-cv-00343-JCS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 17, 19

## I.   INTRODUCTION

Plaintiff David Ney appeals an adverse decision from Defendant Carolyn Colvin, Acting Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423(d), and for Social Security Income under Title XVI, 42 U.S.C. §§ 1381, 1383(f).  The issue on appeal is whether the administrative law judge's ("ALJ's") determination in step four of the Commissioner's five-step analysis was error.  For the reasons discussed below, the Court finds that the ALJ's step four determination was not based on substantial evidence.  The administrative decision is therefore REVERSED and REMANDED for further proceedings consistent with this Order.

## II.   FACTS

Ney was born on February 19, 1963.  Administrative Record ("AR") at 113.  He was forty-nine years old as of November 1, 2012, the alleged onset date of disability.  *Id.* at 78.  Since April 15, 2013, Ney had been living in a veterans' shelter in Santa Rosa.  *Id.* at 239, 265.  The timeline leading up to his homelessness is punctuated by various and severe personal adversities, including divorce, his father's and fiancée's deaths, and his brother's incarceration.  *Id.* at 272.  These events, Ney reports, exacerbated preexisting difficulties including drug addiction, chronic

depression, and anxiety brought on by a history of childhood abuse. *Id.* at 272, 367.

The record reveals that Ney held several jobs throughout intermittent periods between 2000 and 2012. *Id.* at 259. From October 2000 to March 2003, he worked as a "wet process operator"[1]—a machine operator—at a manufacturing company. *Id.* From November 2003 to January 2004, he worked as a forklift driver. *Id.* Ney then later worked as an interoffice mail clerk from February 2004 to February 2005; as a forklift driver again from July 2004 to November 2007; and then finally as a staffing employee from March 2011 to April 2012. *Id.* The record is silent as to Ney's employment from November 2007 to March 2011. *Id.* Ney engaged in only sporadic, part-time work after April 2012. *Id.* at 40.

On May 23, 2013, Ney filed for disability insurance benefits under Title II and Supplemental Security Income under Title XVI of the Social Security Act. *Id.* at 78, 95. His application reported several debilitating physical impairments including numbness in his right hand, high blood pressure, and head, neck, and back injuries. *Id.* at 78–79. He also complained of mental impairments consisting of post-traumatic stress disorder ("PTSD"), depression, and attention deficit hyperactivity disorder ("ADHD"). *Id.*

### A.   The Commissioner's Determinations at the Initial and Reconsideration Levels

The Commissioner issued two written decisions on November 12, 2013[2] finding that Ney did not present a disability pursuant to the Social Security Act. *Id.* at 159–61. The decisions stated that relevant medical records contradicted Ney's complaints of disabling physical impairments. *Id.* at 160. With respect to Ney's complaints of numbness in his right hand, the medical evidence indicated that Ney's "handgrip [was] adequate," and did not impede him from "us[ing his] hand for basic handling of objects." *Id.* Although Ney presented a history of hypertension, "there [were] no indications of major damage to [Ney's] kidneys, eyes, heart or nervous system as a result of [his] blood pressure condition." *Id.* Finally, despite Ney's

---

[1] The parties' briefs interchangeably use the terms, "wet process operator," and "machine operator" to refer to this position. For the sake of clarity, the Court will refer to this position as "machine operator," consistent with the ALJ's written decision.

[2] The two decisions correspond to the Commissioner's determinations for Ney's Title II and Title XVI applications, and are substantively identical. *Compare* AR at 159–64, *with id.* at 165–71.

1   complaints of head, neck, and back injuries, the decision explained "medical evidence show[ed]

2   that [he was] able to walk and move about in a satisfactory manner." *Id.*  There was also "no

3   indication of loss of control or muscle wasting in [Ney's] arms and legs due to nerve damage." *Id.*

4      Additionally, the decision stated that relevant medical evidence contradicted Ney's

5   allegations of severe emotional and mental limitations. *Id.*  Despite his complaints of PTSD,

6   depression, and ADHD, there were "no indications . . . [of] major limitations upon [his] ability to

7   think, communicate, and follow basic instructions or to function adequately in [his] usual daily

8   activities." *Id.*

9      The Commissioner concluded that overall, the medical evidence did not preclude Ney from

10  performing activities requiring him to occasionally lift objects weighing up to fifty pounds, or to

11  stand, walk, or sit for up to six hours in a normal eight-hour workday. *Id.*  Given certain of Ney's

12  documented limitations, however, the Commissioner cautioned that Ney could not perform work

13  that frequently required him to crawl, and could not climb ladders, ropes, or scaffolds. *Id.*  He was

14  also unable to perform work that required special skills or training, or frequent contact with others.

15  *Id.*  Despite these limitations, however, the Commissioner concluded that Ney could return to

16  work in his previous job as a machine operator, in accordance with how that job was generally

17  performed in the national economy. *Id.*  Consequently, the Commissioner denied Ney's Title II

18  and Title XVI applications, finding that he was not disabled. *Id.*

19     On November 20, 2013, Ney filed applications for reconsideration of the Commissioner's

20  decision. *Id.* at 173.  They referenced his ongoing problems with homelessness, anxiety, and

21  depression, but did not indicate any change in medical circumstances. *Id.* at 176–77.  In two

22  written decisions dated February 19, 2014, the Commissioner reaffirmed the previous findings

23  relating to Ney's physical and cognitive disabilities:

24         Based upon the medical findings, it is determined that you are able
           to understand and perform simple tasks.  You have the ability to
25         maintain the pace, persistence, and concentration needed to perform
           unskilled work over a forty hour week.  You are precluded from
26         work requiring public contact.  You are able to relate to coworkers
           and supervisors.  You are able to adapt to routine changes in the
27         work place.

28  *See id.* at 185–91; *see also id.* at 178–84 (denying Ney's application for Title II disability

United States District Court
Northern District of California

3

insurance benefits).  Based on this, the Commissioner concluded that Ney's residual functional capacity ("RFC") did not preclude him from performing other types of work in the national economy:

> Given these limitations, it is determined that you would be unable to return to the skills of your past occupation.  However, based on your age, education and your past work experience, it is determined that you should be able to perform other work that falls within the range of the above limitations.  As your condition should not preclude the engagement of all types of work activity, disability is not established.

*See id.* at 185–91, 178–84.

## B.   The Administrative Hearing

Ney requested an administrative hearing to review the Commissioner's initial and reconsideration decisions.  *Id.* at 192–93.  Administrative Law Judge Maxine Benmour presided over the hearing held on June 18, 2014.  *Id.* at 33.  Ney was present with counsel, along with Marianne Lahley, a witness.  *Id* at 6, 29.  Gerald Belchick, Ph.D., a vocational expert ("VE"), appeared telephonically.  *Id.* at 38.

### 1.  Ney's Testimony

The ALJ briefly questioned Ney about his work history.  *Id.* at 39–40.  Ney recited the chronology of positions worked between 2000 and 2012, although the judge did not explore in any detail the responsibilities, functions, or physical or mental exertions that those jobs required.  *Id.* Following this brief exchange, Ney testified about his alleged disabilities.  *Id.* at 40–45.  He claimed that there were medically determinable impairments that precluded him from performing any work beyond the sedentary level.  *Id.* at 37–38.  He claimed that documentation from his psychological evaluations supported a finding of disability as they indicated, among other things, "moderate to severe problems with concentration, and severe problems with delayed memory." *Id.* at 38.

Ney also testified about the extent of his medical symptoms.  *Id.* at 40–42.  He explained that he first injured his lower back in 2008, and that the pain from that incident had progressively worsened since that time.  *Id.* at 40.  It had grown so severe that it eventually prevented him from working altogether in April 2012.  *Id.* at 40–41.  Aside from interfering with his work, the pain

United States District Court
Northern District of California

also impeded his routine personal tasks on a daily basis. *Id.* at 42–43. Ney testified that although the symptoms were more intense on some days than on others, it was generally most noticeable upon waking in the morning. *Id.* at 41. Physical activity, such as lifting objects for any manner of time, would exacerbate those symptoms. *Id.*

Ney explained that eventually, the pain grew so severe that it extended downward to the backs of his legs. *Id.* at 41–42. Lying down, stretching, and applying ice and heat packs helped to abate those symptoms, but he explained that they would persist nonetheless. *Id.* at 42. Ney sought professional medical treatment in the form of physical therapy with a nurse practitioner, and testified that most recently a separate doctor treated his lower back problems. *Id.* at 42–43. When the ALJ questioned Ney about the medications he used to deal with his pain, he conceded that he had not sought any prescription medication, but instead used only Tylenol. *Id.* at 43–44.

Ney testified about his psychological health issues. *Id.* at 45. He had been receiving counseling for psychological symptoms related to anxiety and depression. *Id.* at 45–46. Ney believed that those issues stemmed from recent adversities in his personal life, including his fiancée's death and his brother's incarceration. *Id.* at 51, 56–58. He referenced PTSD-related symptoms from his military service, but clarified that his service did not include a combat role. *Id.* at 47. Ney believed that his PTSD arose from an abusive sergeant during that time and until his discharge in 1982. *Id.* at 46–48. Because of these psychological health issues, Ney claimed to experience nightmares regularly and had trouble in large settings around other people, particularly in unfamiliar groups. *Id.* at 48–49, 52. Ney had taken Abilify, an antipsychotic medication, to alleviate these symptoms, which he explained "helped somewhat." *Id.* at 46–47, 50.

Because of these physical and psychological impairments, Ney claimed that he has been unable to find gainful employment. *Id.* at 57–58. His back and leg injuries required him to rest and lay down for periods at a time throughout the day. *Id.* at 58. Even sedentary jobs that involved little to no physical exertion was impossible for him to perform because his mental health issues impeded his concentration. *Id.* at 57–58. Ney testified that these limitations have caused him to lead a mostly sedentary daily routine. *Id.* at 52–53. He spent much of this time either at doctor's visits, or at home meditating or watching television. *Id.* at 60–61. Although he lived

5

alone in the veterans' home, Ney required regular help from others to complete ordinary tasks such as washing laundry, or transporting himself from one place to another. *Id.* at 52–53.

### 2. Lahley's Testimony

Marianne Lahley, a licensed clinical social worker from the Veterans Affairs Supportive Housing program in the Department of Housing and Urban Development, testified on Ney's behalf. *Id.* at 61–62. Lahley explained that she began working with Ney in December 2013, who was homeless at the time. *Id.* She helped Ney find shelter in the veterans' home beginning in March 2013, and has kept in regular contact with him since. *Id.* at 63. Lahley presented testimony that corroborated the psychological limitations Ney experienced. *Id.* at 64–70. She testified that during her time with him, Ney exhibited outward depressive symptoms including reclusion, a lack of motivation to conduct routine tasks, and recurring nightmares centered around his deceased fiancée. *Id.* at 64–65. Moreover, Lahley explained that based on her training and expertise in PTSD diagnosis, Ney exhibited "some classic and some not so classic" symptoms of post-traumatic stress. *Id.* at 66–67. Those symptoms included avoidance and isolation, and hyper-arousal and guardedness, which affected Ney's day-to-day activities. *Id.* at 67–68. She testified that those symptoms have prevented Ney from finding employment. *Id.* at 69.

### 3. Belchick's Testimony

Finally, Belchick, a vocational expert, appeared telephonically and testified about Ney's capacity to work in his previous jobs. *Id.* at 70. He detailed background information for each of the positions Ney previously held, as published in the U.S. Department of Labor *Dictionary of Occupational Titles* ("DOT"). *Id.* at 71–76. Belchick explained that Ney's prior work as a forklift driver was a semi-skilled position, categorized in the DOT as requiring physical work at the medium exertional level. *Id.* The DOT classified Ney's mail clerk work as unskilled, rated at the light exertional level.[3] *Id.* at 73. Finally, Ney's work as a machine operator was categorized as a skilled position, rated at the heavy exertional level. *Id.* at 72. Because Belchick later clarified

---

[3] Belchick had initially labeled this position as a technologist, a skilled occupation. *Id.* However, Ney clarified at the administrative hearing that his responsibilities actually involved delivering mail and packages within the company. *Id.* at 72. Based on this information, Belchick reclassified the position as an interoffice mail clerk, an unskilled position. *Id.* at 73.

United States District Court
Northern District of California

United States District Court
Northern District of California

with Ney that, in fact, the position did not require Ney to lift heavy objects, he modified the DOT exertional level from heavy to light.  *Id.*

Following this exchange, the ALJ questioned Belchick about his opinion as to whether Ney could return to any of his prior jobs in light of Ney's demonstrated limited mental engagement and exertional capacities:

> Q:  Okay.  All right, so, now, let's assume a hypothetical individual of the claimant's age, education, and work background [with] the following limitations; lifting and carrying 20 pounds occasionally and ten frequently.  Sitting, standing, walking six hours each in an eight-hour day.  No climbing of ladders, ropes, or scaffolds, and no crawling.  Occasional climbing of ramps and stairs.  Occasionally stooping and crouching.  Frequent balancing and kneeling.
>
> And, also, overhead reaching is occasional bilaterally.  Frequent handling with the left upper extremity.  No work around heights.  Occasional work around moving machinery.  *Limited to simple, repetitive tasks* with no contact with the public and occasional contact with supervisors and coworkers.  Can that person do this claimant's past work?
>
> A:  Not all of it, Your Honor.  He could do the past work as he described and what we determined later was a mail clerk job which was unskilled at the light exertional level, no public contact.  The contact would be interoffice.  He would pick up and deliver mail interoffice.  He couldn't do the forklift job because it's [at the] medium exertional level.  He could do the wet processing operator job as he described it because it is—no, leave that one out.  No, because it's not, so, one job, Your Honor.  The job of mail clerk he could do.

*Id.* at 73–74 (emphasis added).  The ALJ then asked Belchick whether an individual with those proposed limitations could also return to any of his previous work if he or she were to be absent from work more than three times a month.  *Id.* at 74.  Belchick answered that such a limitation would preclude that individual from all jobs:  "[T]he general consent [sic] is that if they're absent more than one day a month repeatedly, month after month, that becomes an unacceptable work practice and that's especially true at the unskilled level."  *Id.*

Ney also questioned Belchick about the scope of work available to persons with his particular limitations.  *Id.* at 75.  Belchick explained that even though Ney previously held jobs at the skilled and semi-skilled levels (machine operator and forklift driver, respectively), those jobs were not transferable because there were no positions requiring the skills for those occupations

1   that could fit the particular physical and psychological restrictions Ney exhibited. *Id.* Ney

2   presented several hypotheticals to Belchick:

> Q: Hypo number three, let's assume a hypothetical individual with the same age, education, and work experience as the claimant. Further assume the following limitations, that they would be limited to sedentary work and must be allowed to elevate their feet to chair level on an occasional basis as needed. Is there any work for such a hypothetical individual?
>
> A: No, Counselor, the standard is as the job is generally performed in the national economy. Any deviation from that standard becomes an accommodation. Jobs in the national economy generally are not performed with the feet elevated. That's an accommodation, and it's an accommodated job and it's not to be considered.
>
> Q: Hypothetical number four, let's assume a hypothetical individual whose only limitation is that they must be allowed to have one 30-minute unscheduled break per day in addition to breaks required by law in order to lay down and take pressure off his spine.
>
> A: Same answer, Counselor. Same answer.
>
> Q: All right. Then, hypothetical number five, let's assume we have a hypothetical person who would be occasionally off task a third of the workday—
>
> A: No, that eliminates all jobs. Five percent off task is acceptable, maybe. Probably really not, but that's the standard feeling is anything in the excess of 5 percent.
>
> Q: All right, anything above 5 percent, not acceptable?
>
> A: Right.

*Id.* at 75–76.

## C.    The ALJ's Analysis and Factual Findings

The ALJ issued a written decision on September 10, 2014, finding that Ney did not qualify for disability benefits under Titles II and XVI of the Social Security Act. *Id.* at 28. The judge conducted the five-step analysis established by the Commissioner for Social Security benefits determinations. 20 C.F.R. § 404.1520;[4] *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir.

---

[4] Duly promulgated agency regulations are binding and carry the force of law:

> Reasonable regulations, when consistent with the laws that authorize them and adopted through proper procedures, have the force of law. *Watson Land Co. v. Comm'r*, 799 F.2d 571, 579 (9th Cir. 1986). Federal courts generally defer to an agency's reasonable

United States District Court
Northern District of California

1999).

The ALJ found at step one that Ney had engaged in substantial gainful activity since November 1, 2012, the alleged date of disability. *Id.*

At step two, the ALJ found that Ney suffered from severe medical impairments that consisted of degenerative disc disease of the lumbar spine (lower back), degenerative disc disease of the cervical spine (neck and upper back), obesity, a personality disorder, an anxiety disorder, and a depressive disorder. *Id.* at 16.

Next, at step three, the ALJ considered whether the impairments established in the previous step satisfied any of the enumerated impairments the Commissioner has recognized as disabling. 20 C.F.R. § 404.1520(a)(4)(iii) & Subpart P, App. 1. The judge found that Ney did not meet Section 1.04 of the Commissioner's recognized impairments for spinal disorders[5] because none of the medical documentation provided any evidence of nerve root or cord compromise. *Id.* at 17–18. The ALJ also found that Ney failed to meet Section 12.04 of the Commissioner's recognized impairments for affective disorders,[6] Section 12.06 for anxiety-related disorders,[7] and

---

interpretations of its own statutes and regulations. *Id.* But federal courts do not need to defer when the interpretation comes from a policy statement, agency manual, or enforcement guideline. *Cmty. Hosp. of the Monterey Peninsula v. Thompson*, 323 F.3d 782, 791 (9th Cir. 2003). Still, a non-controlling interpretation provides proper guidance to the extent that it is thorough, logical, persuasive, and consistent with related interpretations. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

*Furtado v. Colvin*, No. 13-cv-04063-HRL, 2015 U.S. Dist. LEXIS 133636, *5 (N.D. Cal. Sept. 30, 2015).

[5] *See* 20 C.F.R. § 404.1520(a)(4)(iii) & Subpart P, App. 1 § 1.04 (setting forth the criteria needed to find a spine-related disability). To satisfy a disorder under Section 1.04, a claimant must meet the requirements set forth in paragraphs A, B, or C. Subpart P, App. 1 § 1.04.

[6] *See* 20 C.F.R. § 404.1520(a)(4)(iii) & Subpart P, App. 1 § 12.04 (setting forth the criteria needed to find affective disorders). To satisfy a disorder under Section 12.04, a claimant must meet the requirements set forth in paragraphs A and B, or, alternatively, the requirements in paragraph C. Subpart P, App. 1 § 12.04.

[7] *See id.* § 12.06 (setting forth the criteria needed to find anxiety-related disorders). To satisfy a disorder under Section 12.06, a claimant must meet the requirements set forth in paragraphs A and B, or, alternatively, the requirements in paragraphs A and C. *Id.*

United States District Court
Northern District of California

Section 12.08 for personality disorders[8] because none of the medical documentation provided evidence satisfying the respective Paragraph B criteria in those three sections, and additionally failed to satisfy the Paragraph C criteria in Sections 12.04 and 12.06.  AR at 17–19.  Having found that Ney's impairments did not satisfy any relevant recognized impairment, the ALJ moved onto the next step of the analysis.

Step four required the ALJ to make specific factual findings of Ney's RFC and, given those findings, whether he could return to past relevant work.  In a detailed and thorough discussion, the judge considered Ney's relevant documented evidence, as well as evidence set forth from Ney's treating and consulting medical physicians and psychologists.  *Id.* at 20–27.  The ALJ made express credibility determinations on this evidence, finding the record credible as to, among other things, portions of Ney's own testimony as well as the testimony of his witness, Lahley.  *Id.*  As to Ney's RFC, the ALJ found that he was able to perform light work, although he could do so only with certain physical and cognitive limitations:

> . . . [T]he claimant has the residual functional capacity to perform light work as defined in 20 [C.F.R. §§] 404.1567(b) and 416.967(b) except that the claimant can never climb ladders, ropes, or scaffolds, and the claimant can never crawl.  Additionally, the claimant can occasionally climb ramps or stairs, the claimant can occasionally stoop and crouch, and the claimant can frequently balance and kneel.  Furthermore, the claimant can occasionally reach overhead, bilaterally, and the claimant can frequently handle with the left upper extremity.  Moreover, the claimant can never work at heights, and the claimant can occasionally work around moving machinery.  *Finally, the claimant is limited to simple, repetitive tasks with no public contact and occasional contact with supervisors and coworkers.*

*Id.* at 20 (emphasis added).

Next, the ALJ determined whether, given Ney's RFC, he could return to past relevant work—either as Ney actually performed that work, or as that work was generally performed in the national economy.  The ALJ's discussion comparing Ney's RFC to his past relevant work was sparse and undeveloped, as it made only minimal findings of his responsibilities, functions, or

United States District Court
Northern District of California

---

[8] *See id.* § 12.08 (setting forth the criteria needed to find personality disorders).  To satisfy a disorder under Section 12.08, a claimant must meet the requirements set forth in paragraphs A and B.  *Id.*

physical and emotional exertions while working in those previous positions.  The relevant portions of the ALJ's discussion here read in full:

> The claimant has past relevant work as:  a forklift driver (DOT number:   921.683-050), a machine operator (DOT number: 559.382-026), and a mail clerk (DOT number:  209.687-026).  The demands of the claimant's past relevant work as a forklift drive[r] and a machine operator exceed his residual functional capacity, for these occupations are semi-skilled to skilled in nature, whereas the claimant is limited to simple, repetitive, tasks.  Thus, the claimant cannot perform this past relevant work.
>
> Nonetheless, the claimant's residual functional capacity does not restrict him from performing his past relevant work as a mail clerk, both as performed by the claimant and as this work is generally performed in the national economy.  The claimant's work as a mail clerk required physical demands consistent with the light exertional level, and the claimant retains the ability to engage in a range of light work.  Furthermore, this work does not require any non-exertional limitations that the claimant's residual functional capacity precludes.  Therefore, the undersigned finds that the claimant is able to perform his past relevant work as a mail clerk both as the claimant actually performed this work and as it is generally performed in the national economy.  Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the *Dictionary of Occupational Titles*.

*Id.* at 28.  Because the ALJ found that Ney's RFC permitted him to return to past relevant work as a mail clerk, the judge did not proceed to the fifth step of the analysis and instead concluded that Ney was not disabled for purposes of the Social Security Act.

### D.   The Appeals Council and Ney's Complaint

Ney filed an appeal on October 8, 2014 with the Social Security Administration ("SSA") Appeals Council, Office of Disability Adjudication and Review ("Appeals Council").  *Id.* at 7–10.  The Appeals Council denied the request on December 16, 2014,[9] finding no error in the ALJ's decision.  *Id.* at 1–4.

On January 23, 2015, Ney filed a Complaint in the Northern District of California pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking review of the Commissioner's decision.  Complaint ("Compl.," dkt. 1).  The Commissioner filed an Answer on May 11, 2015.  Answer ("Ans.," dkt.

---

[9] An ALJ's denial is final when the Appeals Council denies a request to review the decision. *Gillett-Netting v. Barnhart*, 371 F.3d 593, 595 (9th Cir. 2004).

15).  Ney and the Commissioner filed Motions for Summary Judgment on June 5, 2015, and July 6, 2015, respectively.  Plaintiff's Motion for Summary Judgment ("Ney's MSJ," dkt. 17); Defendant's Motion for Summary Judgment ("Commissioner's MSJ," dkt. 19).

### E.    The Motions for Summary Judgment

In his Motion for Summary Judgment, Ney disputes the ALJ's step four determination, arguing that the judge failed to base her determination on substantial evidence in the record.  Ney does not dispute the ALJ's RFC findings, but instead alleges that the judge failed to make the requisite findings of fact that he could return to his past relevant work as a mail clerk, as he had actually performed it.  Ney's MSJ at 29–31.  Moreover, he argues that the judge's conclusion that he could return to the mail clerk position, as the position was generally performed in the national economy, was also legal error because it required a reasoning level incompatible with his cognitive RFC.  *Id.* at 31–37.  Ney argues that the ALJ failed to make any findings of fact to resolve this inconsistency, as she was required to do.  *Id.* at 33.  These defects, Ney concludes, warrants a reversal of the administrative opinion, and a remand for an award of disability benefits. *Id.* at 37.

The Commissioner filed a Motion for Summary Judgment seeking this Court to uphold the administrative decision.  She argues that, notwithstanding the inconsistency between cognitive reasoning levels and Ney's RFC, the ALJ's decision was substantially supported by other medical evidence in the record "overall."  Commissioner's MSJ at 6.  Moreover, the Commissioner argues that the ALJ's failure to identify or address the inconsistency was harmless error.  *Id.* at 5–7.

## III.   ANALYSIS

### A.    Standard of Review

A district court may review the ALJ's decision to determine whether the judge's findings are supported by substantial evidence and free of legal error.  42 U.S.C. § 405(g); *Bray v. Comm'r of the Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).  The court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole."  42 U.S.C. § 405(g); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (citing *Schneider v. Comm'r of the Soc. Sec. Admin.*,

223 F.3d 968, 973 (9th Cir. 2000)).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

In determining whether substantial evidence supports an ALJ's subsidiary factual determinations, the court may not substitute its judgment for that of the judge. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003); *Ceguerra v. Sec'y of Health & Human Servs*, 933 F.2d 735, 738 (9th Cir. 1991) ("A reviewing court can evaluate an agency's decision only on the grounds articulated by the agency.").  Rather, the court must review the record as a whole and consider adverse as well as supporting evidence. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" (quoting *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989))); *see also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007).  Where evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).

## B.   The Commissioner's Five-Step Analysis

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or . . . can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is found to be disabled only if "his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

The Commissioner has established a five-step sequential process to determine whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; *Tackett*, 180 F.3d at 1098.  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098.  The burden of proof rests on the claimant for steps one through four, but shifts to the Commissioner at step five. *Id.*

At step one, the ALJ considers whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If so, the ALJ finds that the claimant is not disabled, regardless of his medical condition or age, education, and work experience.  *Id.* § 404.1520(b).  If the claimant is not engaged in substantial gainful activity, the ALJ proceeds to the next step.

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment," or combination of such impairments, which meets the durational requirement set forth in 20 C.F.R. § 404.1509.  Unless the impairment is expected to result in death, it must have lasted, or must be expected to last, for a continuous period of at least twelve months.  *Id.*  Moreover, an impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  *Id.* § 404.1520(c).  If the claimant does not have a severe impairment, disability benefits are denied at this step.  *Id.*  If it is determined that one or more impairments are severe, the ALJ continues to the next step of the analysis.

At step three, the ALJ compares the medical severity of the claimant's impairments with a compiled listing of impairments that the Commissioner has designated as disabling. *Id.* § 404.1520(a)(4)(iii) & Subpart P, App. 1.  If one or a combination of the claimant's impairments meet or equal a listed impairment, the claimant is found to be disabled. *Id.* 404.1520(a)(4)(iii).  Otherwise, the analysis proceeds to the next step.

At step four, the ALJ considers the claimant's RFC in light of his impairments. *Id.* §§ 404.1520(a)(4)(iv), 404.1560(b) (defining past relevant work as "work . . . done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it").  Then, taking into consideration the extent of that RFC, the ALJ determines whether the claimant can perform past relevant work.  *Id.* § 404.1520(a)(4)(iv).  If the claimant can do so, he or she is found to not be disabled.  *Id.*  If the claimant cannot do so, the analysis proceeds to the fifth and final step of the analysis.

At step five, the burden shifts to the Commissioner to show that the claimant, in light of his RFC, can nevertheless perform other jobs.  *Id.* § 404.1520(f); *Tackett*, 180 F.3d at 1098.  A claimant who is able to perform other jobs that are available in significant numbers in the national economy is not considered disabled, and will not receive disability benefits.

United States District Court
Northern District of California

*Id.* §§ 404.1520(a)(4)(v), 404.1520(f).  Conversely, where there are no jobs available in significant numbers in the national economy that the claimant can perform, the claimant is found to be disabled.  *Id.*

**C.     Whether the ALJ's Step Four Determination Was Supported by Substantial Evidence**

Ney argues that the ALJ's step four determination was error because it was not supported by substantial evidence in the record.  He does not dispute the ALJ's RFC findings, but instead claims that the judge improperly used those findings to conclude that he could return to past relevant work as a mail clerk.  He argues that the ALJ failed to make specific factual findings about how he had actually performed work in that position in the past.  He also claims that the judge failed to resolve an inconsistency between his cognitive RFC and the reasoning level required for the mail clerk position as it was generally performed in the national economy.  Ney argues that without these findings, the ALJ's conclusion that he could return to past relevant work was unsupported by substantial evidence.

The Commissioner concedes the argument to the extent that Ney's RFC precluded him from returning to work as a mail clerk, as he actually performed it.  However, she argues that Ney could still work in the position, as it was generally performed in the national economy.  The Commissioner also acknowledges that the ALJ failed to address an inconsistency between Ney's RFC and the cognitive requirements generally needed for the mail clerk position; however, she argues that other evidence in the record substantially supported the judge's step four determination.  Moreover, the Commissioner argues that the oversight was harmless error.

For the reasons discussed below, the Court finds that the ALJ's analysis in step four was reversible error because it was not based on substantial evidence in the record.

**1.     Step Four of the Commissioner's Five-Step Analysis Required the ALJ to Make Specific Factual Findings about Ney's Past Relevant Work, and to Resolve Conflicts Between The Vocational Expert's Opinion and the Occupational Requirements Published in the *Dictionary of Occupational Titles***

As noted above, step four of the Commissioner's five-step analysis required the ALJ to consider whether Ney retained the RFC to perform past relevant work.  *Id.* §§ 404.1520(a)(4)(iv),

404.1560(b); *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990). The inquiry required the ALJ to make "specific factual findings" as to the claimant's RFC, the physical and mental demands of the claimant's past work, and whether, given that RFC, the claimant could return to past work—either as the work was actually performed or as that work is generally performed based on a national standard. SSR 82-62, 1982 SSR LEXIS 27 (Aug. 20, 1980);[10] *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e).

Under the SSRs, past relevant work is considered in two contexts—work as the claimant actually performed it, and work as it is generally performed in the national economy. SSR 82-61, 1982 SSR LEXIS 31 (Jan. 1, 1982). To determine work as actually performed, the SSRs require the ALJ to make specific and detailed findings for such factors as the claimant's responsibilities, functions, and physical exertions in that position. SSR 82–62. When mental or emotional impairments are at issue, "care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety," including such factors as the speed, precision, complexity required of certain tasks, and whether the job necessitates a worker to exercise independent judgment. *Id.*

To determine work as generally performed, the SSRs specify that the ALJ should "rely primarily on the DOT . . . for information about the requirements of work in the national economy." SSR 00-4p, 2000 SSR LEXIS 8 (Dec. 4, 2000). VEs are often consulted at this stage to provide supplemental evidence, and may be particularly helpful "to resolve complex vocational issues" during the administrative hearing. *Id.* The SSRs caution, however, that neither the VE's opinion nor the DOT classifications supersedes the other; rather, the ALJ is tasked with the responsibility to develop the record with specific factual findings and to resolve conflicts between

---

[10] Social Security Rulings ("SSRs"), according to the governing regulations, "are binding on all components of the Social Security Administration" and "represent precedent[ial] final opinions and orders and statements of policy and interpretations" of the SSA. 20 C.F.R. § 402.35(b)(1); *see also Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984) (noting the function of SSRs). "SSRs reflect the official interpretation of the [SSA] and are entitled to 'some deference' as long as they are consistent with the Social Security Act and regulations." *Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) (quoting *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 n.2 (9th Cir. 2005)). SSRs do not carry the "force of law," but they are binding on ALJs nonetheless. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 n.6 (9th Cir. 1989).

the expert's opinion and the occupational requirements listed in the DOT:

> Occupational evidence provided by a VE or VS [vocational specialist] generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.  *At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.*

> Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

*Id.* (emphasis added).

The SSRs underscore the importance of specific factual findings at this stage of the analysis.  SSR 82–62 ("Since this is an important and, in some instances, a controlling issue," the ALJ's determination has "far-reaching implications and must be developed and explained fully.").  They elaborate:

> Determination of the claimant's ability to do [past relevant work] requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits [his or her] ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles*, etc., on the requirements of the work as generally performed in the economy.

*Id.* at 4.  Although the claimant bears the burden in step four to show that he or she cannot perform such work, the ALJ nevertheless has a duty to make sufficient findings of fact to support the determination.  *Id.*; *see* 20 C.F.R. §§ 404.1571 & 416.971, 404.1574 & 416.974, 404.1565 & 416.965; *see also Pinto v. Massanari*, 249 F.3d 840, 844–45 (9th Cir. 2001).  In the absence of explicit findings regarding the claimant's prior job, a statement that he or she can or cannot perform the prior job "is conclusory and not supported by substantial evidence." *Banks v. Barnhart*, 434 F. Supp. 2d 800, 807 (C.D. Cal. 2006); *see also Pinto*, 249 F.3d at 845 ("We may set aside a denial of benefits if 'it is not supported by substantial evidence or it is based on legal

1    error.'" (quoting *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999)

2    (citations and quotation marks omitted))).

### 2. The ALJ's Findings as to Whether Ney's Residual Functional Capacity Permitted Him to Return to Past Relevant Work Was Unsupported By Substantial Evidence.

#### a.   The ALJ's Residual Functional Capacity Findings

Here, neither party disputes the ALJ's RFC findings.  The judge undertook a detailed analysis of Ney's physical and mental limitations by considering relevant medical evidence and making specific credibility determinations with respect to medical opinions from his treating physicians.  As to Ney's cognitive limitations, the ALJ credited the diagnoses of his treating psychologists, explaining that Ney's "limit[ation] to simple tasks is consistent with findings of impaired delayed recall and impaired serial seven testing through the psychological consultative examination, and it has support from the claimant's frequent reports of distractibility."  AR at 26.  The judge therefore determined that Ney's cognitive limitations precluded him from work beyond "simple, repetitive tasks."  *Id.*  These findings for Ney's RFC are well supported in the record.

The ALJ was next required to consider Ney's past relevant work, including the functions, exertions, and responsibilities those positions entailed.  However, the ALJ made only minimal inquiry into the nature of Ney's past work as a forklift driver, machine operator, and mail clerk.

#### b.   The Forklift Driver and Machine Operator Positions

With respect to the forklift driver and machine operator positions, the ALJ made no findings whatsoever as to how Ney previously performed those jobs, and only minimal findings as to how those jobs were generally performed in the national economy.  She noted that those positions were characterized as semi-skilled to skilled work, and were therefore incompatible with Ney's cognitive limitation to simple, repetitive tasks.  Based on this factor alone, the judge concluded that Ney's RFC precluded him from returning to work both as a forklift driver and machine operator.  Based on this record, the ALJ has not set forth "specific factual findings" to support her determination, as she was required to do.

United States District Court
Northern District of California

c.   The Mail Clerk Position, as Actually Performed

For the mail clerk position, the ALJ similarly failed to make sufficient factual findings to support her determination that Ney's RFC did not preclude him from returning to that position as he actually performed that work in the past.  Here, the extent of the ALJ's analysis is the following two sentences:  "The claimant's work as a mail clerk required physical demands consistent with the light exertional level, and the claimant retains the ability to engage in a range of light work. Furthermore, this work does not require any non-exertional limitations that the claimant's residual functional capacity precludes."  AR at 20.  Absent from this is any discussion of Ney's specific responsibilities as a mail clerk, his functions in that position, or the degree of physical or cognitive exertion that the position required.  SSR 82-62 cautioned that "care must be taken to obtain a precise description of the particular job duties," including such factors as the speed, precision, complexity required of certain tasks, and whether the job necessitated a worker to exercise independent judgment.  None of that was done here.  The transcript from the administrative hearing reflects this observation as well, as the ALJ made no inquiry into the specific demands the mail clerk position actually required from Ney.  Without more, the judge's determination that Ney's RFC did not preclude him from returning to work as actually performed in the mail clerk position "is conclusory and not supported by substantial evidence."  *Banks*, 434 F. Supp. 2d at 807.

In fact, the record evidence contradicts the ALJ's conclusion.  The judge determined that Ney's RFC limited him to stooping and crouching only "occasionally."  AR at 20.  However, Ney's work history report indicates that his previous work as a mail clerk required him to stoop three hours and crouch six hours during each work day.  AR at 277.  Indeed, the Commissioner, in her motion papers, concedes that Ney's RFC precludes him from returning to this work as he actually performed it:  "[B]ecause Plaintiff reported in his Work History report that he actually performed the mail clerk job . . . with crouching six hours and stooping three hours (as opposed to just occasionally (AR 277), Plaintiff could not perform the job as actually performed (*compare with* [sic] RFC at AR 20)."  Commissioner's MSJ at 3.

d.   The Mail Clerk Position, as Generally Performed

The ALJ also determined that Ney's RFC did not preclude him from performing work as a mail clerk, as that work was generally performed in the national economy.  Ney argues this was error because the mail clerk position, as it was generally performed, required a cognitive reasoning level incompatible with Ney's RFC.  Ney cites to a recent Ninth Circuit opinion, *Zavalin v. Colvin*, 778 F.3d 842, 847 (9th Cir. 2015), to argue that the DOT's classification of that position at Level 3 reasoning was incompatible with his cognitive limitation to "simple, repetitive tasks."  *See* U.S. Dep't of Labor, *Dictionary of Occupational Titles*, App. C ("Components of the Definition Trailer") (1993) (defining Level 3 reasoning).  Because the ALJ overlooked this inconsistency, she made no findings to resolve the discrepancy.  The ALJ's determination, Ney argues, was not supported by substantial evidence, and was therefore error.  The Court agrees.

*Zavalin* presented the Ninth Circuit with circumstances similar to those here, in which the ALJ determined that the claimant's RFC restricted him to performing only "simple, routine, or repetitive tasks."  778 F.3d at 845.  Notwithstanding this finding, the ALJ in *Zavalin* concluded that the claimant was capable of performing work the DOT categorized as requiring Level 3 reasoning.  *Id.*  The claimant argued that this determination was inconsistent with his cognitive RFC.  *Id.*

The *Zavalin* court agreed, holding that "there [was] an apparent conflict between the residual functional capacity to perform simple, repetitive tasks, and the demands of Level 3 Reasoning."  *Id.* at 847.  In reaching that conclusion, the court compared Level 2 reasoning to Level 3 reasoning:

> LEVEL 2
>
> Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.   Deal with problems involving a few concrete variables in or from standardized situations.
>
> LEVEL 3
>
> Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form.   Deal with problems involving several concrete variables in or from standardized situations.

20

1    *Id.* The court explained that the limitation to simple, routine tasks was at odds with Level 3's

2    requirements because "it may be difficult for a person limited to simple, repetitive tasks to follow

3    instructions in 'diagrammatic form' as such instructions can be abstract." *Id.* (citing *Adams*, No. C

4    10-2008 DMR, 2011 U.S. Dist. LEXIS 51662, *12–13 (N.D. Cal. May 13, 2011)).  Rather, the

5    court explained that those cognitive limitations were more akin to Level 2 reasoning.  *Id.*  The ALJ

6    had not recognized the inconsistency, and concluded without further discussion that the claimant's

7    RFC did not preclude him from doing work requiring Level 3 reasoning.  *Id.* at 844–45.  On these

8    bases, the court remanded the case.  *Id.* at 846–48.

9            The circumstances Ney presents here are analogous to those in *Zavalin*.  Here, the ALJ

10   relied on the DOT to determine whether Ney's RFC precluded him from returning to work as a

11   mail clerk.  She explained that the position required physical demands rated at the "light"

12   exertional level, consistent with the physical limitations in Ney's RFC.  She cited also to

13   Belchick's expert opinions and concluded, without any discussion, that the expert's findings were

14   "consistent with the information contained in the [DOT]."  Based on this undeveloped analysis,

15   the ALJ concluded that Ney could to past relevant work as a mail clerk, as that position was

16   generally performed in the national economy.

17           This analysis was incomplete, as it focused only on Ney's physical RFC and failed to

18   address his cognitive limitations in relation to the mental demands of the mail clerk position.  Like

19   in *Zavalin*, the position here required Level 3 reasoning, which demanded from Ney the ability to

20   "apply commonsense understanding to carry out instructions furnished in written, oral, or

21   diagrammatic form," and "deal with problems involving several concrete variables in or from

22   standardized situations."  Ney's cognitive RFC, however, precluded him from performing work

23   beyond "simple, repetitive tasks."  As *Zavalin* explained, this "inherent inconsistency" arises,

24   particularly because the mail clerk position, as it was generally performed, could require Ney to

25   follow abstract, diagrammatic instructions, incompatible with his RFC.  Because the ALJ failed to

26   recognize this discrepancy, she did not ask Belchick why a person with Ney's limitations could

27   nevertheless meet the demands of Level 3 reasoning.  *See Zavalin*, 778 F.3d at 846 ("When there

28   is an apparent conflict between the vocational expert's testimony and the DOT—for example,

1   expert testimony that a claimant can perform an occupation involving DOT requirements that

2   appear more than the claimant can handle—the ALJ is required to reconcile the inconsistency."

3   (citing *Massachi v. Astrue*, 486 F.3d 1149, 1153–54 (9th Cir. 2007)).

4          The Commissioner argues that notwithstanding this oversight, the Court should affirm the

5   administrative decision because other evidence in the record provided substantial evidence

6   "overall" for the ALJ's determination.  Commissioner's MSJ at 6.  As support, the Commissioner

7   references the published Specific Vocational Preparation ("SVP") and skill levels listed in the

8   DOT corresponding to the mail clerk position.  This argument, however, overlooks the fact that

9   the SVP and skill level designations measure occupational demands different from the DOT's

10  listed reasoning level.  SVP levels are used to gauge the amount of time generally needed for a

11  new worker "to learn the techniques, acquire the information, and develop the facility needed for

12  average performance in a specific job-worker situation."  DOT, App. C (II).  Moreover, the

13  Commissioner uses published skill level designations—"unskilled," "semi-skilled," and "skilled"

14  work—primarily as a way to determine a worker's ability to transfer from one occupation to

15  another.  20 C.F.R. § 404.1568.  In contrast, the purpose of the DOT's published reasoning levels

16  is to gauge the cognitive demands "required of the worker for satisfactory job performance" in

17  each particular job occupation.  DOT, App. C (II).  It is a designation that measures whether the

18  worker possesses the requisite reasoning ability to perform work typically needed in that job.  The

19  ALJ's failure to address the incompatibility between the mail clerk's Level 3 reasoning and Ney's

20  cognitive RFC was error, notwithstanding the fact that the SVP or skill level designations might

21  otherwise have been compatible with Ney's qualifications.

22          Finally, the Commissioner argues that the ALJ's oversight was harmless.  "A reviewing

23  court cannot consider an error harmless unless it can conclude confidently that no reasonable ALJ,

24  when properly crediting the testimony, could not have reached a different disability

25  determination."  *Jones v. Colvin*, No. 14-cv-05260-EMC, 2015 U.S. Dist. LEXIS 139366, *29–31

26  (N.D. Cal. Oct. 13, 2015) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1051 (9th Cir.

27  2006)).  An error is harmless only if it is "inconsequential to the ultimate nondisability

28  determination."  *Stout*, 454 F.3d at 1051.  Here, it cannot be said that the ALJ's errors were

United States District Court
Northern District of California

22

United States District Court
Northern District of California

harmless.  The judge concluded that Ney retained the RFC to return to past relevant work as a mail clerk, both as he actually performed that work in the past, and as that work was generally performed.  But, Ney's self-reported work history report suggested that returning to that past work, as he actually performed it, would require physical demands beyond his RFC.  Also, as *Zavalin* held, returning to work as a mail clerk as that job was generally performed in the national economy would require cognitive demands inconsistent with Ney's limitation to simple, repetitive tasks.  Therefore, the Court cannot confidently conclude that no reasonable ALJ, when properly crediting the testimony, would not have reached a different disability determination here.

### D.    Remand

Ney argues that the Court should remand for a reinstatement of benefits.  Whether to remand for further proceedings or award benefits is within the discretion of the Court.  *Salvador v. Sullivan*, 917 F.2d 13, 15 (9th Cir. 1990); *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  Remand for further proceedings is warranted where additional administrative proceedings could remedy defects in the decision.  *Kail v. Heckler*, 722 F.2d 1496, 1497 (9th Cir. 1984).  The Ninth Circuit has devised a three-part credit-as-true standard, each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits:  (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.  *See Garrison v. Colvin*, 759 F.3d 995, 1021–22 (9th Cir. 2014); *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1202 (9th Cir. 2008).  Because the record has not been fully developed here, the Court may not remand for reinstatement of benefits.  Moreover, further proceedings may remedy the defects discussed in this Order.  Ney's request to remand for a reinstatement of benefits is therefore denied.

### IV.    CONCLUSION

For the reasons discussed above, the Court finds that the ALJ's step four determination was error, and the administrative decision is therefore reversed.  The Court GRANTS Ney's

United States District Court
Northern District of California

1   Motion for Summary Judgment and DENIES the Commissioner's Motion for Summary Judgment.

2   The Court REMANDS the matter (1) for a determination of whether Ney's residual functional

3   capacity precludes him from returning to past relevant work, and (2) an award of benefits

4   consistent with that determination and this Order.

5         **IT IS SO ORDERED.**

6   Dated:  December 8, 2015

7

8   JOSEPH C. SPERO
    Chief Magistrate Judge